**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: <br><br> Helen Levinson, <br><br>         Debtor, | Chapter 7 <br><br> Case No. 19-31961 <br><br> Honorable Timothy Barnes |
| Harvest Finance Group LLC, <br><br>         Plaintiff, <br> v. <br><br> Helen Levinson, <br><br>         Defendant. | Complaint for: <br><br> Nondischargeability of Debt <br> 11 U.S.C. §523(a)(2) and (6) <br><br> Adv. Pro. No. _____ |

**COMPLAINT TO DETERMINE DEBT IS NONDISCHARGEABLE**
**PURSUANT TO 11 U.S.C. §523(a)(2) AND (a)(6)**

Plaintiff Harvest Finance Group LLC ("Plaintiff" or "Harvest"), a creditor in the underlying bankruptcy case, for its complaint against the debtor, Helen Levinson ("Defendant"), under 11 U.S.C. §§ 523(a)(2) and (a)(6), states as follows:

## Jurisdiction

1. This adversary proceeding arises in Defendant's Chapter 7 bankruptcy case. The case is pending before this Court as number 19-31961.

2. Pursuant to 28 U.S.C. § 1334(b), this Court has subject matter jurisdiction over this proceeding, which is referred here pursuant to 28 U.S.C. §157(a) and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

3. This is a core proceeding under 28 U.S.C. §157(b)((2)(A) and (I), and this Court has constitutional authority to enter final judgments and orders thereon.

If any portion of this proceeding is not a core proceeding or a bankruptcy judge does not have constitutional authority to enter final judgments in this proceeding, Plaintiff consents, pursuant to 28 U.S.C. § 157(c)(2), to a bankruptcy judge hearing and finally determining the proceeding and entering appropriate orders and judgments.

4. This Court is the proper venue for this adversary proceeding pursuant to 28 U.S.C. § 1409.

## Background Facts

5. On November 8, 2019, Defendant filed a voluntary petition for relief under Chapter 7 of title 11, United States Code (11 U.S.C. §§ 101, et seq.), in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division commencing the above referenced case.

6. Harvest is a financial services company. Harvest purchases invoices from businesses who require more timely conversion of receivables into cash. This service is often referred to as factoring of receivables, which is a common form of working capital funding for many small and medium sized businesses.

7. Harvest is a small privately owned company that has been financially devastated by the Defendant's fraudulent actions.

8. Harvest holds the largest claim against Defendant. It is owed more than $1,100,000 due to a personal guarantee the Defendant issued to backstop the debt Defendant's wholly-owned company, Indigo Interactive, Inc. ("Indigo"), owes Harvest.

9. Harvest started to purchase invoices from Indigo in 2014.

10. Defendant reviewed and approved all invoices that Harvest purchased from Indigo.

11. .Indigo emailed its invoices directly to its customers. Indigo would then forward these emails to Harvest, along with the accompanying invoices, to document that the purchased invoices are genuine and had been sent to the customers.

12. Prior to Harvest advancing any funds to Indigo, Defendant would direct Harvest as to how and where the funds should be transferred or applied.

13. All funding, purchased invoices, and collected invoices were posted in Harvest's accounting system. On a regular basis, Harvest provided to Defendant various activity reports which included detailed aging of open invoices, listing of purchased invoices, listing of collected invoices, and other account activity.

14. Harvest's purchase of invoices was governed by a Factoring Agreement dated August 1, 2014 (the "Factoring Agreement"). A copy of the Factoring Agreement is attached as Exhibit A. The Factoring Agreement provided, in pertinent part, that to "induce [Harvest] to purchase Accounts from [Indigo], with full knowledge that the truth and accuracy of the following are being relied upon by [Harvest] in the purchase of and payment for the Purchased Accounts, [Indigo] represents, warrants and covenants to [Harvest] and agrees that:

    A) The correct amount owed on each Account is as set forth on the document tendering such Account to Purchaser and such amount is not in dispute;

    B) the payment of each Account is not contingent upon the fulfillment of any obligation or condition, past or future. and any and all obligations required of [Indigo] with regard to such Account have been fulfilled by [Indigo],

    C) Each Account is based on an actual sale and delivery of goods and/ or services actually rendered for which an invoice has been tendered to the Account Debtor, is presently due and owing to [Indigo], is not past

due or in default, has not been previously sold, assigned, transferred or pledged, and is free of any encumbrance or lien:

D) There are no defenses, offsets, or counterclaims with respect to any of the Accounts and no agreement has been made under which the Account Debtor may claim any deduction or discount except as otherwise stated in any of the invoices submitted to Purchaser in connection with the tender of such Account for purchase[.]"

15. In mid-2019, Indigo ceased operating. When Indigo ceased operating, Harvest was left with a large deficiency claim against Indigo.

16. Invoices Harvest purchased from Indigo were not genuine obligations owed to Indigo. Defendant knew many of the invoices Harvest was induced to purchase from Indigo did not document genuine obligations owed to Indigo. Defendant concealed this information from Harvest to fraudulently induce Harvest to purchase invoices and to continue its business relationship with Indigo.

17. Defendant and Indigo submitted fake invoices to Harvest and induced Harvest to purchase those invoices based upon false representations that Defendant knew were false and were intended to mislead and defraud Harvest.

18. Some of the invoices were fake because they were never sent to customers. These invoices were never sent to customers because Defendant manufactured invoices solely to fraudulently induce Plaintiff to purchase them.

19. Defendant also manufactured fake emails and sent them to Harvest to mislead Harvest into believing the invoices had been sent to Indigo's customers.

20. Some of the invoices were fake because they misrepresented the scope of the work Indigo performed.

21. Some of the invoices were fake because they were for services that Indigo's customers never authorized.

{00177384}    4

22. Some of the invoices were fake because they were for services that had been billed previously or services that were not compensable because they were for warranty work.

23. Defendant orchestrated and implemented the fraudulent scheme to induce Harvest to continue to purchase invoices from Indigo and to fund over-advances.

24. In 2015, Defendant also submitted a materially false financial statement to Harvest to induce Harvest to expand its lending relationship with Indigo. The financial statement was materially false because it represented that the Debtor owned substantial assets, including land in Jordan (the "Jordan Property"), a retirement account at Merrill Lynch worth $250,000, savings accounts at North Shore Community Bank and Bank of America that had $250,000 and a single-family home with $260,000 of equity.

25. On several occasions during the relationship between Indigo and Plaintiff, Defendant reaffirmed to Martin Wayne, Harvest's owner, that she still owns the Jordan Property equally with her two sisters and mother. On December 13, 2018, Defendant told Mr. Wayne that she and her family may sell the 100 acres of the Jordan Property for $1,100,000, and as a 25% owner, she would receive 25% of the sale proceeds. On May 29, 2019, Defendant told Mr. Wayne the family was still trying to sell the land after a deal fell through for $900,000.

26. On information and belief, Defendant's multiple representations regarding the Jordan Property were intentional lies. Plaintiff served a subpoena on Defendant that asked for all documents related to the Jordan Property. Defendant stated that she did not have any documents related to the Jordan Property. If Defendant had any documents related to the Jordan Property then she concealed, destroyed or failed to keep or preserve such documents.

27. Defendant also falsely represented to Martin Wayne that she would be able to repay Plaintiff the amount owed to Plaintiff. On January 21, 2019, Defendant advised Martin Wayne that: "Marty please know I would never file bankruptcy, I would never jeopardize my relationship with you or harm you that way." Defendant also represented on March 29, 2019: "I promise to get us whole with you Marty." Based upon these representations Plaintiff continued to do business with Indigo and have confidence and trust in Defendant. Meanwhile, during this period, the Defendant knowingly continued to submit fraudulent invoices in order to secure additional funding from Plaintiff.

### **Indigo Interactive**

28. Defendant owned 100% of the stock of Indigo Interactive, Inc. and was in complete control of Indigo and its business operations.

29. Indigo provided software products and services to quality assurance organizations by automating their workflow to capture, report, and analyze compliance standards data.

30. Indigo had two main products: The Jura product and the Loup product. At the end of 2018, Indigo had approximately 17 employees, in addition to several independent contractors.

31. Several of Indigo's employees and independent contractors were software developers, engineers, and technology professionals who developed and managed both custom and SAAS web applications for customers who mainly consisted of nationally recognized accreditation organizations.

32. An accreditation organization typically is a not for profit that provides licensing and accreditation to professionals or educational institutions in a particular field.

33. One of Indigo's customers was the Council on Social Work Education, Inc. ("CSWE"). CSWE is a national association that accredits social work education programs. It was founded in 1952 and its members include over 800 accredited baccalaureate and master's degree social work programs, as well as individual social work education, practitioners, and agencies dedicated to advancing quality social work education. CSWE's Commission on Accreditation is recognized by the Council for Higher Education Accreditation as the sole accrediting agency for social work education in the United States and its territories

34. Another customer was the Commission on Accreditation of Allied Health Care Professionals ("CAAHEP"). CAAHEP is a programmatic postsecondary accrediting agency recognized by the Council for Higher Education Accreditation and carries out its accrediting activities in cooperation with 25 review Committees on Accreditation. CAAHEP accredits more than 2200 entry level education programs in 32 health science professions. The agency was formed in 1994.

35. Another customer was the Commission on Accreditation for Respiratory Care ("CoARC"). CoARC accredits degree-granting programs in respiratory care that have undergone a rigorous process of voluntary peer review and have met or exceeded the minimum accreditation standards as set by the professional association in cooperation with CoARC. The agency was founded in 1954.

36. Another customer was the American Speech-Language-Hearing Association ("ASHA"). ASHA is the nation's leading professional, credentialing, and scientific organization for speech-language pathologists, audiologists, and speech/language/hearing scientists. ASHA has been the leader of these professions for over 94 years, initiating the development of national standards for audiologists and speech-language pathologists and certification since 1952.

37. Another customer was Council for the Accreditation of Educator Preparation ("CAEP"). CAEP is a nationally recognized evidence-based accrediting

body that assures quality and supports continuous improvement to strengthen P-12 student learning. CAEP has been the sole accrediting body for education preparation providers since 2013 and has more than 800 educator preparation providers who participate in the CAEP accreditation system.

38. In 2014, Indigo and Plaintiff discussed entering into a financial relationship whereby Plaintiff would purchase the invoices that Indigo generated for services performed on behalf of its customers. Indigo's customer would then remit payment of the full amount of the invoice to Plaintiff.

39. Plaintiff generally requires a personal guaranty from the owner of a business that has a factoring relationship with Plaintiff.

40. Plaintiff requested and obtained from Defendant a personal guaranty whereby Defendant guaranteed the full amount that Indigo owed to Plaintiff (the "Guaranty")A copy of the Guaranty is attached as Exhibit B.

41. In pertinent part, the Guaranty provides that:

> The Guarantors, and each of them, hereby jointly and severally unconditionally guarantee, for the benefit of each and every present and future holder or holders of the indebtedness Hereby Guaranteed (all hereinafter called the "Obligees"), the full and prompt payment to the Obligees at maturity (whether at the stated maturities thereof, or by acceleration or otherwise) of the Indebtedness Hereby Guaranteed, and the full and prompt performance arid observance by the Debtor of all the warranties, covenants and agreements contained in the Factoring Agreement and the Indebtedness Hereby Guaranteed to be performed and observed by the Debtor, and not by way of limitation, to *this* end the Guarantors, and each of them. jointly and severally, covenant and agree to take all such actions necessary to enable the Debtor to observe and perform and to refrain from taking any action which would prevent the Debtor

from observing and performing, each and every such warranty, covenant and agreement.

42. Plaintiff requested and obtained from Defendant a personal financial statement (the "PFS") whereby Defendant disclosed her assets and liabilities. A copy of the PFS is attached as Exhibit C.

43. Defendant's PFS reported she owned a piece of real estate in Madaba, Jordan and that her interest in the real estate was worth $300,000. The PFS also reported that she owned a single-family home that was valued $450,000 and that she had $300,000 in cash, checking, and savings accounts. The PFS also reported that Defendant owned a retirement account worth $250,000. All told, Defendant reported to Plaintiff that she had total assets of $1,350,000 and total net worth of $1,109,800, as of May 1, 2015.

44. Based upon Defendant's representations in the PFS, Plaintiff continued to purchase Indigo invoices and provide funding to Indigo on a regular and consistent basis in years 2014 through 2019. Total annual invoices submitted by Indigo and purchased by Plaintiff were as follows:

   a. $   476,450 in 2014
   b. $   595,684 in 2015
   c. $1,053,126 in 2016
   d. $1,318,558 in 2017
   e. $1,863,662 in 2018
   f. $   624,565 in 2019

## The Scheme to Defraud

45. During 2018 and 2019, Indigo was involved in several legal disputes and litigation with a few of its larger vendors pertaining to amounts Indigo owed them. Indigo entered into settlement agreements and monthly payment plans with at least two of these vendors. Indigo was also a defendant in litigation with its

{00177384}   9

prior landlord as a result of Indigo vacating its office space prior to the termination of its lease.

46. During this time, Indigo's book of business appeared to be increasing and Harvest continued to factor the invoices submitted by the Defendant. On information and belief, between January and May of 2019, Indigo took out at least four merchant cash advance loans (the "MCA Loans") totaling at least $180,000.

47. Indigo pledged its assets to secure the MCA Loans in contravention of its obligations under the Factoring Agreement. Defendant also signed personal guarantees for the MCA Loans. Plaintiff was not aware at the time of all these newly funded MCA Loans signed by Defendant.

### The Fictitious Invoices and other Lies

48. Defendant also misrepresented in writing to Plaintiff the amount that Indigo owed to Microsoft, one of Indigo's key vendors. Microsoft provided Azure cloud computing, which was critical to Indigo's building testing, deploying, and managing applications for its customers. Defendant was aware that losing access to the cloud jeopardized Indigo's ability to operate as a going concern.

49. Defendant also lied to Martin Wayne, Plaintiff's owner, in July 2019, about CSWE agreeing to issue approximately $45,000 of partial invoice payments. Defendant repeatedly assured Plaintiff that only minimal work was required to service the CSWE account and that upon completion of this work CSWE would remit approximately $45,000 of invoice payments to Plaintiff (the "CSWE Representations").

50. The CSWE Representations were made to induce Plaintiff to continue to provide funds to Indigo. The only amount that CSWE owed and paid in August 2019 was approximately $2,100. No other amounts were due on the Indigo invoices and CSWE had not promised Defendant that the $45,000 payment was

forthcoming as Defendant had repeatedly stated to Plaintiff. The CSWE Representations were knowingly false.

51. Defendant fraudulently induced Plaintiff to advance funds to Indigo by fabricating at least 12 fictitious invoices purportedly addressed to CSWE totaling $101,400. The fictitious invoices consist of invoice numbers 9101, 9117, 9121, 9125, 9130, 9137, 9146, 9143, 9144, 9154, 9161, 9163. All of these fictitious invoices were dated between March 1, 2019 and April 19, 2019 (the "CSWE Invoices").

52. Defendant forwarded to Plaintiff falsified emails on or about the dates of the above-referenced invoices that Defendant represented she had sent to CSWE. Plaintiff did this to falsely induce Plaintiff to reasonably believe that the accompanying invoices were valid, had been submitted to CSWE for payment, and could be purchased by Plaintiff. None of the CSWE Invoices and emails were received by CSWE and appear to have been fabricated by Defendant solely to fraudulently induce Plaintiff to purchase the CSWE Invoices. Defendant knew that payment was not forthcoming from CSWE for the services set forth on these fictitious invoices.

53. As an example, on March 1, 2019, Defendant forwarded to Plaintiff a false email she purportedly sent to two employees at CSWE, along with false Invoice No. 9101 in the amount of $21,750. Defendant's email to Plaintiff indicated she was sending the invoice to Plaintiff to "cover the $16 K funding request for today." As a result of Defendant's representation that Invoice No. 9101 had been sent to CSWE and was a legitimate statement of work performed for which CSWE was obligated to pay, Plaintiff transferred $16,000 to Indigo. CSWE never received this false invoice or the email.

54. Defendant also fraudulently induced Plaintiff to advance funds to Indigo by fabricating at least six fictitious invoices purportedly addressed to CAAHEP in the aggregate amount of $37,725 (the "CAAHEP Invoices"). The fictitious invoices consisted of invoice numbers 9116, 9120, 9122, 9136, 9158 and

{00177384}    11

9162. All of these fictitious invoices were dated between March 7, 2019 and April 19, 2019.

55. Defendant forwarded to Plaintiff falsified emails that Defendant purportedly had sent to CAAHEP on or about the dates of the respective invoices in order to induce Plaintiff to reasonably believe that the accompanying invoices were valid, had been submitted to CAAHEP for payment, and could be purchased by Plaintiff. None of the CAAHEP Invoices and emails were received by CAAHEP and appear to have been fabricated by Defendant solely to fraudulently induce Plaintiff to purchase the CAAHEP Invoices.

56. Defendant also altered at least 10 other invoices addressed to CAAHEP by fabricating the invoice description and/or the date and sent those fabricated invoices to Plaintiff for funding.

57. Defendant also fraudulently induced Plaintiff to advance funds to Indigo by fabricating at least eight fictitious invoices purportedly addressed to ASHA in the aggregate amount of $75,950 (the "ASHA Invoices"). The fictitious invoices consisted of invoice numbers 9041, 9056, 9073, 9085, 9119, 9123, 9135, 9151. All of these fictitious invoices were dated between December 31, 2018 and April 12, 2019.

58. Defendant forwarded to Plaintiff falsified emails on or about the dates of the respective invoices that Defendant purportedly had sent to ASHA in order to induce Plaintiff to reasonably believe that the accompanying invoices were valid, had been submitted to ASHA for payment, and could be purchased by Plaintiff. None of the ASHA Invoices and emails were received by ASHA and appear to have been fabricated by Defendant solely to fraudulently induce Plaintiff to purchase the ASHA Invoices.

59. Defendant also fraudulently induced Plaintiff to advance funds to Indigo by fabricating at least five fictitious invoices purportedly addressed to

CoARC in the aggregate amount of $83,700 (the "CoARC Invoices"). The fictitious invoices consisted of invoice numbers 8996, 9034, 9088, 9134, 9150, 9190. All of these invoices were dated between November 14, 2018 and August 1, 2019.

60. Defendant forwarded to Plaintiff falsified emails on or about the dates of the respective invoices that Defendant purportedly had sent to CoARC in order to induce Plaintiff to reasonably believe that the accompanying invoices were valid, had been submitted to CoARC for payment, and could be purchased by Plaintiff. At least two of the CoARC Invoices and emails were never received by CoARC and appear to have been fabricated by Defendant solely to fraudulently induce Plaintiff to purchase the CoARC Invoices. At least two of the CoARC Invoices were rejected by CoARC because they sought $41,400 for warranty work that CoARC had no obligation to pay.

61. Defendant also altered at least five other invoices addressed to CoARC by fabricating the invoice description and/or the date and sent those fabricated invoices to Plaintiff for funding.

62. Defendant fraudulently induced Plaintiff to advance funds to Indigo by fabricating at least 13 fictitious invoices purportedly addressed to CAEP totaling $171,804.50 (the "CAEP Invoices"). The fictitious invoices consist of invoice numbers 9018, 9021, 9025, 9035, 9072, 9086, 9084, 9111, 9112, 9115, 9124, 9132, 9160. All of these fictitious invoices were dated between November 29, 2018 and April 19, 2019.

63. Plaintiff relied upon Defendant's assurances that the CAEP Invoices were valid and legitimate, and the services rendered as represented on the CAEP invoices were authorized and approved by CAEP. However, under the agreement between Indigo and CAEP, Indigo was never entitled to bill CAEP for this work, and CAEP was not obligated to pay the CAEP Invoices.

64. There are various invoices of smaller amounts to other Indigo customers which Plaintiff purchased from Defendant which Plaintiff believes were fabricated.

65. Defendant advised Plaintiff that over $457,800 of invoice payments would be collected from customers in the summer of 2019, so long as Plaintiff continued to provide funding to Indigo. Based upon such representations, Plaintiff continued to advance funds to Indigo and elected not to pursue its rights against Indigo. Instead of collecting $457,800, actual collections were only $44,993.85. The paltry collections were a function of Defendant's fictitious invoicing scheme.

## COUNT I
## DETERMINATION OF
## NON-DISCHARGEABILITY UNDER § 523(a)(2)
## FOR FRAUDULENT INVOICING

66. Plaintiff re-alleges and incorporates all of the above paragraphs as they pertain to this count as though fully restated herein verbatim.

67. Pursuant to 11 U.S.C. § 523(a)(2), a discharge under section 727 does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

68. The elements of a claim for fraud consist of a false statement of material fact; knowledge by defendant that the statement is false; intent to induce the other party to act; reliance by plaintiff on that misrepresentation; and injury caused by that reliance.

69. Defendant made a false statement of a material fact when she represented to Plaintiff that the emails and corresponding invoices she transmitted to Plaintiff contained invoices that were eligible for purchase by Plaintiff.

70. Defendant knew the representations she made to Plaintiff regarding the invoices were false when she made them or she made them with a reckless disregard for their truth.

71. Defendant had first-hand knowledge that the emails and the accompanying invoices were not genuine.

72. Defendant knew that the invoices had been fabricated solely to induce Plaintiff to purchase them.

73. Defendant also knew that some of the invoices were for services that were not compensable.

74. Defendant also knew the customer would never pay some of the invoices she submitted to Plaintiff and that Plaintiff would never recover the funds it advanced to purchase such invoices.

75. Defendant also made false representations and statements with an intent to deceive and to induce reliance by Plaintiff.

76. Plaintiff reasonably relied upon the misrepresentations and false statements of Defendant.

77. Plaintiff purchased invoices from Defendant for several years. Plaintiff had no reason to suspect that invoices had been fabricated by Defendant.

78. Plaintiff had no reason to suspect that invoices reflected work that was not compensable by a customer.

79. Plaintiff was fraudulently induced to purchase invoices that customers were never going to pay.

80. Plaintiff also advanced additional funds to Indigo based upon Defendant's false statements. Plaintiff would not have advanced funds to Indigo had it known that Defendant made false representations to Plaintiff.

81. Plaintiff also would have enforced its remedies against Indigo and Defendant sooner if Defendant had not made false statements and representations to Plaintiff.

82. Plaintiff was injured by the false statements and representations that Defendant made. Injury consists of the loss of substantial property.

83. The debt Defendant owes to Plaintiff was procured by false pretenses, actual fraud, and a false representation within the meaning of 11 U.S.C. § 523(a)(2).

84. Because the damage done to Plaintiff was brought about by Defendant's fraudulent activity, her liability is not dischargeable under 11 U.S.C. §523(a)(2)(A).

WHEREFORE, Plaintiff prays that the Court:

A) Enter judgment in her favor on Count I of this complaint and award Plaintiff compensatory damages of $ 1,114,315.24, plus interest from the Petition Date through judgment at the applicable rate.

B) Find that Plaintiff's claim against Defendant is non-dischargeable under 11 U.S.C. § 523 (a)(2)(A);

C) Grant any such further relief as the Court finds appropriate under the circumstances.

## COUNT II
## DETERMINATION OF
## NON-DISCHARGEABILITY UNDER § 523(a)(2)
## RELATED TO FINANCIAL STATEMENT

85. Plaintiff re-alleges and incorporates all of the above paragraphs as they pertain to this count as though fully restated herein verbatim.

86. Section 523(a)(2) of the Bankruptcy Code provides that a discharge under section 727, … does not discharge an individual debtor from any debt to the extent obtained by "use of a statement in writing--(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive. 11 U.S.C. § 523(a)(2).

87. The PFS is a materially false writing related to Defendant's financial condition. The PFS is materially false because it reported that Defendant owned real estate in Madaba, Jordan worth $300,000, that she owned a home worth $450,000, that she had savings accounts holding $250,000, that she had cash and checking accounts holding $50,000, and she owned a retirement brokerage account worth $250,000.

88. Defendant's bankruptcy schedules indicate that Defendant never owned the Madaba, Jordan property, the $450,000 home and the other assets listed in her PFS or that she knowingly and fraudulently failed to disclose such property in her bankruptcy schedules.

89. Defendant's bankruptcy schedules also indicate that instead of owning assets worth more than $1,350,000, Defendant owned assets worth less than $50,000.

90. Defendant has failed to explain satisfactorily the reduction of her assets from more than $1,350,000 to $50,000.

91. Plaintiff reasonably relied upon the false PFS in deciding to expand and continue its funding relationship with Indigo.

92. Defendant tendered the fraudulent PFS to Plaintiff with an intent to deceive Plaintiff into believing that she had sufficient assets to provide the credit support that Plaintiff required. 11 U.S.C. § 523(a)(2).

WHEREFORE, Plaintiff prays that the Court:

A) Enter judgment in its favor on Count II of this complaint and award Plaintiff compensatory damages of $ 1,114,315.24, plus interest from the Petition Date through judgment at the applicable rate and punitive damages;

B) Find that Plaintiff's claim against Defendant is non-dischargeable under 11 U.S.C. § 523(a)(2);

C) Grant any such further relief as the Court finds appropriate under the circumstances.

## COUNT III
## DETERMINATION OF
## NON-DISCHARGEABILITY RELATED TO
## WILLFUL AND MALICIOUS INJURY §523(a)(6)

93. Plaintiff re-alleges and incorporates all of the above paragraphs as they pertain to this count as though fully restated herein verbatim.

94. Section 523(a)(6) excepts from a bankruptcy discharge any debt for willful and malicious injury by the debtor to another entity or their property.

95. Defendant willfully and maliciously injured Plaintiff through the conduct described herein.

96. Defendant's conduct was willful in that her actions were voluntary, intentional and deliberate.

97. Defendant's actions were malicious because she intended to cause harm to Plaintiff or she knew that her actions were substantially certain to cause harm.

98. As a result of Defendant's willful and malicious conduct, Plaintiff was injured in the amount of not less than $1,100,00.

WHEREFORE, Plaintiff prays that the Court:

A) Enter judgment in its favor on Count III of this complaint and award Plaintiff compensatory damages of $ 1,114,315.24, plus interest from the Petition Date through judgment at the applicable rate and punitive damages;

B) ;Find that the amount Defendant owes to Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(6);

C) Grant any such further relief as the Court finds appropriate under the circumstances.

## COUNT IV
## BREACH OF GUARANTY

99. Plaintiff re-alleges and incorporates all of the above paragraphs as they pertain to this count as though fully restated herein verbatim.

100. Defendant executed an agreement in favor of Plaintiff whereby she promised to unconditionally guarantee the full and prompt payment to Plaintiff of all amounts Indigo owes to Plaintiff.

101. Indigo has failed to pay Plaintiff the amount owed to Plaintiff under the Factoring Agreement and because of such failure, Defendant is obligated to pay such amounts to Plaintiff pursuant to the express terms of the Guaranty.

102. Plaintiff performed all of the obligations imposed upon Plaintiff in to enforce the Guaranty.

{00177384} 19

103. As a direct result of the breach of the Guaranty and the failure of Defendant to pay Plaintiff the amounts Defendant has guaranteed, Plaintiff has been damaged in the sum of at least $1,114,315.24,

WHEREFORE, Plaintiff prays that the Court:

A) Enter judgment in its favor on Count III of this complaint and award Plaintiff compensatory damages of $ 1,114,315.24, plus interest from the Petition Date through judgment at the applicable rate and punitive damages;

B) Find that the amount Defendant owes to Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(6);

C) Grant any such further relief as the Court finds appropriate under the circumstances.

October 9, 2020                                                  Respectfully Submitted,

**Harvest Finance Group LLC**

By:/s/ William J. Factor
One of Its Attorneys

William J. Factor (6205675)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Firm ID: 45665
Tel:   (312) 878-6976
Fax:   (847) 574-8233
Email: wfactor@wfactorlaw.com